**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **CHRISTOPHER FLACCO and WINTON SINGLETARY,** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **Case No. 24-cv-4374-MAK** |
| | : | |
| **DANIELLE OUTLAW, CHARLES RAMSEY, RICHARD ROSS, JR., JOHN STANFORD, JR., KEVIN BETHEL, MICHAEL ZACCAGNI, PEDRO RODRIGUEZ, ALBERT D'ATTILIO, and CANDI JONES, in their individual capacities, and THE CITY OF PHILADELPHIA,** | : | |
| **Defendants.** | : | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' CLASS CERTIFICATION MOTION**

Plaintiffs respectfully submit this Memorandum to support their Class Certification Motion.

## I.      INTRODUCTION

Christopher Flacco and Winton Singletary ("Named Plaintiffs") filed this action for themselves and approximately 230 of their current and former co-workers: Captains, Staff Inspectors, Inspectors, and Chief Inspectors of the City of Philadelphia Police Department ("Class members"). Plaintiffs seek to recover unpaid wages that Civil Service Regulation ("CSR") 31.06 mandates they should have received *in lieu* of compensatory time for emergency work they performed beyond their scheduled hours since approximately 2013. Extensive evidence establishes that the Class members had similar job titles and duties, worked under the same terms and conditions of employment, tracked their time the same way, had their wages calculated the same way, performed unpaid emergency work beyond their scheduled hours, were required by CSR 31.06 to receive wages for this work and, regardless of which Philadelphia Police Department ("PPD") Commissioner or Office of Human Resources ("OHR") Director they served under, have

1

routinely been denied these wages since 2013 (except for a few specific instances when the federal or state government provided funds for an emergency activation).

Plaintiffs seek class certification for: "All PPD Captains, Staff Inspectors, Inspectors, or Chief Inspectors who have performed unpaid emergency work beyond their scheduled hours since September 23, 2013."[1]  As demonstrated by the record evidence discussed below, the people who meet this definition satisfy the criteria for class certification in Fed. R. Civ. P. 23(a) and (b)(3), meaning they possess common claims that are appropriate for class-wide resolution.

Defendants argue that Plaintiffs' claims are unmanageable, atypical of the Class, and lacking commonality because the Individual Defendants served as Commissioners and OHR Directors at different times, meaning Plaintiffs will have to link their claims to each of their tenures in a way that would create confusing sub-classes.  Plaintiffs see no merit in this argument, because all Defendants applied the relevant policies and regulations the same way and caused PPD ranking officers to continuously perform emergency work beyond their regular schedules without pay since 2013, meaning there is no material difference between their tenures; even if individual damage calculations are needed, class certification is still appropriate;[2] and the City has agreed to indemnify the Individual Defendants for any judgment entered on Plaintiffs' claims, (App1-16), meaning there is no *bona fide* reason for Plaintiffs to attribute their damages among the Individual Defendants.

## II.    COMMON, MATERIAL FACTS SUPPORTING CLASS CERTIFICATION

Throughout the relevant period, Defendants maintained consistent and uniformly-applied

---

[1] The Individual Defendants are excluded from this definition and the putative Class.

[2] *See Davis v. Target Corp.*, 2023 WL 8373162, *5 (n.6) (E.D. Pa. Dec. 1, 2023) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well-nigh universal"), *citing Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 (3d Cir. 2015).

policies, practices, and systems to assign and track emergency work the Class members performed beyond their regularly-scheduled hours and credit them with comp time (paid on a 1:1 basis up to 1,300 hours) under PPD Directive 11.10 instead of paying wages for this work under CSR 31.06. *See* PPD Directive 11.10 (App17-22); CSR 31.06 (App25).

In March 2025, Named Plaintiffs provided sworn Responses to Defendants' Interrogatories that demonstrated the shared nature of their claims by establishing:

1. Defendants were individually, collectively, and ultimately responsible for administering all hours of work, human resources, overtime, payroll, and wage and hour policies and systems applied to PPD ranking officers and ensuring CSR 31.06 was properly implemented and effectuated with respect to PPD ranking officers, (App30, 45-46) (Response 4);

2. Defendants were individually, collectively, and ultimately responsible for scheduling and authorizing PPD ranking officers' emergency work, properly tracking and reporting this work, and ensuring they were properly paid for all hours worked, (App31-32, 46-48) (Responses 5, 8-9);

3. Contemporaneous time and work records in Defendants' control demonstrate that Named Plaintiffs performed hundreds of hours of emergency work beyond their regularly-scheduled hours at the direction of their commanding officers, (App29, 44) (Response 1);

4. Named Plaintiffs' emergency work consisted of work their superiors ordered or authorized beyond their regularly-scheduled hours that related to an emergent event (*e.g.,* police shootings, riots, protests, looting events, hostage situations), (App30, 45) (Response 3);

5. Named Plaintiffs were trained to enter all work hours beyond their 8-hour schedule in their Daily Attendance Report ("DAR") under "Code 31" except when they were specifically told to use another code (as when the federal or state government provided funds for an emergency), causing most of this work to be tracked under Code 31 and some to be tracked under other Codes 35, 43, 46, 75, 78, and 85, (App33, 48) (Response 10) and (App56-59) (OT codes);

6. From 2013 through 2025, in scores of meetings and briefings Named Plaintiffs attended, the Individual Defendants were repeatedly asked if PPD ranking officers would be paid for their

authorized emergency work and consistently rebuffed these inquiries, (App34-38, 49-53) (Responses 13-14, 18); and

7. Named Plaintiffs did not learn of the existence of CSR 31.06 until 2023, (App31, 47) (Response 6).

*See* Named Plaintiffs' Interrogatory Responses (App26-55).

In March 2025, Individual Defendants produced documents containing the common policies at the heart of Plaintiffs' claims, including:

1. PPD Directive 11.1 (Daily Attendance Report), providing a common procedure for all PPD ranking officers to record their attendance, work time, and overtime hours, (App61-69);

2. PPD Directive 11.1, Appendix C (Overtime Codes), providing a common series of codes for all PPD ranking officers to record their overtime hours, including Codes 31, 35, 43, 46, 75, 78, and 85 which were used for work beyond their regular schedules, (App56-60); and

3. PPD Directive 11.10 (Overtime Pay and Compensatory Time), providing a common entitlement to all PPD ranking officers: "All sworn employees at the rank of Captain or above, shall be granted compensatory time, in lieu of overtime pay, <u>for all hours worked in excess of 8 hours per day or 40 hours per week</u>… computed on an hour for hour basis, and [] accrued up to 1300 hours," (App17-22) (emphasis added).

Defendants used these policies to provide PPD ranking officers with a common, uniform system to record the emergency work they performed beyond their regularly-scheduled hours and provide them with compensatory time (*in lieu* of wages) for this work up to 1,300 hours.

In March 2025, Named Plaintiffs produced a document demonstrating the shared nature of their claims, namely:

A Nov. 13, 2013 Memorandum from OHR Director D'Attilio to "All Offices, Boards and Commissions," sharing updated "pages to be inserted in your copy of the Civil Service Regulations" reflecting updates "effective Sept. 23, 2013" that included "Interim Regulations," including Regulation 31.06 (Emergency overtime pay for ranking officers in the police and fire departments) providing a common entitlement to all PPD and PFD ranking officers: "ranking

officers of Captain to Chief Police Inspector inclusive in the Police Department and ranking officers of Battalion Chief and above in the Fire Department authorized to work by their respective Commissioners <u>during a period of emergency nature, in excess of the number of hours of their regularly scheduled work day or, for all hours worked on a nonscheduled work day shall, for all hours of such overtime work, be paid at their then regular rate of pay. Personnel paid in accordance with this Section will not be entitled to accrue compensatory time during the period of the emergency</u>," (App23-25) (emphasis added).

Thus, while PPD Directive 11.10 allowed Defendants to provide PPD ranking officers with compensatory time for "hours they worked in excess of 8 hours per day or 40 hours per week," CSR 31.06 created an exception, mandating that PPD ranking officers receive wages, not compensatory time, for hours worked beyond their regular schedule during an emergency. *Cf.* PPD Directive 11.10 (App17-22) *with* CSR 31.06 (App23-25).

In May 2025, the Individual Defendants served sworn Responses to Plaintiffs' Interrogatories further demonstrating the similarity of Plaintiffs' claims by establishing:

1. The Individual Defendants did not cause any PPD ranking officer to be paid any wages for emergency work they performed beyond their scheduled hours under CSR 31.06 because they believe they are only "entitled to be paid for work in excess of standard workday hours when provided for in the CBA between the City of Philadelphia and the FOP, or otherwise negotiated between the City of Philadelphia and the FOP in [] special circumstances or events," (App76-77, 85-86) (Responses 4, 14);

2. They agree PPD ranking officers used "Assignment code 31 to log time worked in excess of standard working hours," (App77-78) (Response 5);

3. They did not make any effort to notify, inform, or communicate with any PPD ranking officer about the enactment or provisions of CSR 31.06, (App83-85) (Responses 11-12);

4. They did not offer or provide any procedural protections to PPD ranking officers before depriving them of wages under CSR 31.06, (App86) (Response 15); and

5. They did not perform any investigation into PPD ranking officers' entitlement to wages for emergency work they performed beyond their scheduled hours under CSR 31.06 before Plaintiffs filed this action, (App88) (Response 18);

*See* Individual Defendants' (Amended) Interrogatory Responses (App70-98).

In June 2025, the City served sworn Responses to Plaintiffs' Interrogatories that further suggest Plaintiffs' claims are appropriate for class certification, because:

1. 230 people have worked as PPD ranking officers from 2013 to present, (App102) (Response 1);

2. PPD ranking officers were all subject to the same agreements or policies relating to hours worked, timekeeping, overtime, wage payment, and payroll, (App102-103) (Response 2);

3. The same systems and procedures were used to assign emergency work to PPD and PFD ranking officers beyond their regularly-scheduled hours, (App103-104, 108-109) (Responses 3, 8);

4. The City did not cause any PPD ranking officer to be paid any wages for emergency work they performed beyond their scheduled hours under CSR 31.06 because it believes they are only "entitled to be paid for work in excess of standard workday hours only when provided for in the CBA between the City and the FOP [] or otherwise negotiated between the City and the FOP in connection with special circumstances or events," (App104-106) (Response 4);

5. PPD ranking officers all used the same systems or procedures to track the emergency work they performed beyond their regularly-scheduled hours, (App106-107) (Response 5);

6. The City did not make any effort to notify, inform, or communicate with any PPD ranking officer about the enactment or provisions of CSR 31.06 other than by publishing the entire Civil Service Regulations on its website, (App110-112) (Responses 11-12);

7. The City did not offer or provide any procedural protections to PPD ranking officers before depriving them of wages under CSR 31.06, (App113-114) (Response 15); and

8. The City did not perform any investigation into PPD ranking officers' entitlement to wages for emergency work they performed beyond their scheduled hours under CSR 31.06, (App115)

(Response 18).

*See* City Interrogatory Responses (App99-120).

From April to July 2025, the City produced documents cementing the similarity of

Plaintiffs' claims, including:

1.  A PPD Pay Schedule, demonstrating the Class members are all paid on a common schedule, within a similar range, and receive identical pay increases at the same times, (App121-125);

2.  Many Operations Orders describing the PPD command structure, details, objectives, plans, staffing, and location for dozens of large-scale events, indicating that Defendants routinely scheduled PPD ranking officers' emergency work the same way, (App126-263);

3.  PPD Directive 32 (Daily Attendance Report), which imposed common procedures and systems for all PPD ranking officers to account for their attendance, time worked, and "the number of hours and method of accrual for overtime or compensatory time earned," which included various overtime codes, (App264-278); and

4.  Thousands of pages of Code 31 DAR reports from the relevant period that demonstrate PPD ranking officers routinely and consistently recorded substantial time worked beyond their regular schedules, (App279-282) (showing, for example, 72 separate Code 31 entries from PPD ranking officers on Jan. 3, 2022).

In addition, ten different Class members have submitted sworn Declarations describing the

wide range of common experiences they shared as PPD ranking officers, including:

1.  That Defendants were individually, collectively, and ultimately responsible for: managing their employment application process; determining if they would be hired, transferred, or promoted; setting the rules and conditions relating to their employment; determining how these rules and conditions were applied and enforced; providing training on these rules and conditions; setting their work schedules; assigning their work and directing how it would be performed; providing day-to-day supervision; reviewing and evaluating their job performance; being responsible for disciplining, suspending or terminating them; determining the timekeeping methods and systems they used; tracking their work hours; setting the department's payroll policies; processing their time records and approving their work time for payment; controlling all records

7

relating to their employment; and being responsible to ensure they were properly paid for all hours they worked, (App284, 288-289, 292-293, 297, 300-301, 304-305, 309, 313, 317-318, 322);

2.  That they spent an average of more than four hours per week beyond their regular 40-hour schedule performing a wide range of emergency work, (App284-285, 289, 293, 297-298, 301, 305, 309-310, 313-314, 318, 322);

3.  That they regularly attended meetings discussing these emergencies, the work needed to respond to them, and how and where they would do this work, during which no Defendant ever discussed CSR 31.06 or PPD ranking officers being paid wages to perform emergency work beyond their regularly-scheduled hours, (App285-286, 290, 294, 298, 302, 306, 310, 314-315, 319, 323);

4.  That they exercised reasonable diligence to discover their entitlement to be paid for their work by attending meetings and otherwise communicating with Defendants, union representatives, and the City's Labor Relations Unit about time and pay issues, and requesting wages for their emergency work, but did not learn from these efforts they were entitled to wages for emergency work they performed beyond their regularly-scheduled hours, (App286, 290, 294, 299, 302-303, 306-307, 311, 315, 319-320, 323-324);

5.  That, at no point since September 2013, did Defendants ensure they properly tracked all the emergency work they performed beyond their regular schedule, pay wages for any hour spent on emergency work beyond their regularly-scheduled hours, or provide due process before denying these wages, (App285-286, 290, 294, 298, 302, 306, 310, 314-315, 319, 323);

6.  That they did not learn about CSR 31.06, or its requirement that PPD ranking officers be paid wages for emergency work beyond their regularly-scheduled hours until approximately 2024, (App286, 290, 295, 299, 303, 307, 311, 315, 320, 324);

7.  Their present understanding that CSR 31.06 requires ranking officers in the Police and Fire Departments to be paid overtime wages for all hours they spend on emergency work beyond their regular schedules, and that ranking officers in the Fire Department have been regularly receiving wages for performing emergency work beyond their regularly-scheduled hours under CSR 31.06 for years, (App287, 291, 295, 299, 303, 307, 311, 316, 320, 324);

8. Their present understanding that Defendants should have implemented CSR 31.06 for all PPD ranking officers, notified all PPD ranking officers about the Regulation and their entitlement to receive wages for all emergency work they performed beyond their regular schedule, tracked all emergency work they performed beyond their regular schedule, ensured they were paid all wages owed for this emergency work, and provided due process before refusing to provide these wages, (App285, 289-290, 294, 298, 302, 306, 310, 314, 319, 323); and

9. Their belief, based on their experience working as a PPD ranking officer and communicating with other PPD ranking officers, that the facts and issues presented in this case are common among them and should be resolved together (App286, 291, 295, 299, 303, 307, 311, 316, 320, 324).

*See* Class member Declarations (App283-324).

All the record evidence described above plainly demonstrates that, across the relevant period, the approximately 230 Class members' claims share an overwhelming number of common, material facts, including that:

1. They were jointly employed by the City and the Individual Defendants and their claims present the same legal issues around this determination;

2. They all worked in similar jobs (*i.e.*, as PPD ranking officers), with similar job description and responsibilities;

3. They were classified as non-exempt, hourly employees;

4. They were paid a fixed hourly wage, within a similar range, and identical pay increases all set by a common schedule;

5. They all worked in a PPD office within the City of Philadelphia, all of which used the same timekeeping systems and technology;

6. They all received approximately the same hourly rate of pay and were entitled to receive overtime premium wages for working more than 40 hours in a seven-day workweek;

7. They all worked under the same policies relating to hours worked, timekeeping, DARs, overtime work and hours, wage payment, payroll, and compensatory time;

8.  They all used the same overtime codes to report and attribute the work they performed beyond their regular schedules;

9.  They were subject to the same disciplinary policies and practices;

10. They received the same training on the wage and hour policies and practices applicable to their work, and had access to the same information on these topics through the City's Intranet;

11. They used the same timekeeping system to clock-in and clock-out of work each day;

12. They were typically scheduled to work 40 hours per week;

13. At the direction of their commanding officers, they routinely spent 3-4 hours beyond their regular schedule each week on emergency-related work (*e.g.,* staffing police shootings, riots, protests, looting events, and hostage situations);

14. The same systems and procedures (including the issuance of Operations Orders, Command Briefings, Command Incident Briefings, and Command Post-Incident Debriefings) were used to schedule and assign the emergency work they performed beyond their regularly-scheduled hours;

15. They typically used Overtime Code 31 and various other overtime codes to record this work;

16. When they worked over 40 hours per week on non-emergency activities, PPD Directive 11.10 entitled them to receive one hour of compensatory time for each hour they worked, up to 1,300 hours;

17. When they worked over 40 hours per week on emergency activities, CSR 31.06 did not allow compensatory time to be provided and mandated overtime wages be paid for each hour they worked;

18. From 2013 through 2025, they attended scores of meetings and briefings and otherwise communicated with Defendants, union representatives, and the City's Labor Relations Unit about being paid wages for performing emergency work beyond their regularly-scheduled hours, but these inquiries were consistently rebuffed;

19. No Defendant caused any PPD ranking officer to be paid any wages for any emergency work they performed beyond their scheduled hours during the relevant period;

20. No Defendant made any effort to notify, inform, or communicate with any PPD ranking officer about their entitlement to be paid wages for emergency work they performed beyond their regularly-scheduled hours;

21. No Defendant offered or provided any procedural protection to any PPD ranking officer before depriving them of wages under CSR 31.06; and

22. They did not learn of the existence of CSR 31.06 or their right to be paid overtime wages for performing emergency work beyond their regularly-scheduled hours until approximately 2024.

Because Named Plaintiffs' and the Class members' work and claims share so many common facts, they meet the requirements for Rule 23 class certification.

## III.    ARGUMENT

### A.    Strong Public Policy Grounds Favor Class Certification

Pennsylvania's federal courts have repeatedly noted that class actions serve an important social purpose by making possible the effective assertion of many claims that otherwise might not be litigated.  *See, e.g., Bianucci v. Rite Aid Corp.,* 2025 WL 2166015, *8 (E.D. Pa. July 30, 2025) ("Proceeding as a class action permits class members with small claims to vindicate their rights"); *Taha v. Bucks Cty. Pennsylvania*, 408 F. Supp. 3d 628, 648 (E.D. Pa. 2019) (class action mechanism "aggregates many claims—often because there would otherwise be no incentive to bring an individual claim"); *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 191 (E.D. Pa. 2014) (thousands of plaintiffs with relatively small, nearly identical claims might not otherwise seek or obtain relief absent a class action).

Pennsylvania's federal courts have also repeatedly recognized that class actions present substantial benefits, both to litigants and the court system, because they promote efficiency and fairness in the handling of large numbers of similar claims.  *See, e.g., Riaubia v. Hyundai Motor Am*., 2019 WL 3714497, *7 (E.D. Pa. Aug. 7, 2019) ("resolution of these claims as a class action

is superior to individual lawsuits because it promotes efficiency"); *In re Processed Egg Prod. Antitrust Litig.*, 130 F. Supp. 3d 945, 953 (n.12) (E.D. Pa. 2015) ("in class actions, courts have equitable powers to manage the litigation in order to promote judicial economy and fairness to litigants"); *Kromnick v. State Farm Ins. Co.*, 1986 WL 7193, at *2 (E.D. Pa. June 20, 1986) (principles of efficiency and economy of litigation underlie federal class action rules).

Consequently, Pennsylvania's federal courts strongly favor class certification and have repeatedly instructed that class certification motions should be liberally granted. *In re Actiq Sales & Mktg. Pracs. Litig.,* 307 F.R.D. 150, 172 (E.D. Pa. 2015) ("It is a strong and off-repeated [sic] policy of this Commonwealth that decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action"); *Bros. v. Portage Nat'l Bank*, 2009 WL 10730421, *7 (W.D. Pa. Mar. 24, 2009) (noting policy considerations that favor class actions). *See Samuel-Bassett v. Kia Motors America, Inc.,* 34 A.3d 1 (Pa. 2011) (noting "Pennsylvania's policy favoring certification of class actions").

This case is particularly well-suited for class certification. Named Plaintiffs and the Class members all worked in similar jobs in Philadelphia, received common training, worked under the same terms and conditions, had the same systems track their work hours and calculate their wages, and now pursue the same claims for emergency work wages that none of them have ever received (except for a few specific instances when the federal or state government provided funds for an emergency activation). The Plaintiffs who submitted declarations in support of this Motion claim to have worked an average of more than four unpaid overtime hours per week. *See* Declarations (App284-285, 289, 293, 297-298, 301, 305, 309-310, 313-314, 318, 322). Given the favored status of class actions in Pennsylvania and the obvious commonality of material facts, this Court should certify the proposed Class.

B.    **This Action Meets The Requirements For Class Certification Under Rule 23(a)(1) – (a)(4)**

For a lawsuit to proceed as a class action, the plaintiff must introduce facts meeting the four requirements of Federal Rule of Civil Procedure 23(a), namely:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately assert and protect the interests of the class.

As discussed below, the instant matter satisfies all of these requirements.

1.    **The Class is so numerous that joinder is impracticable**

"Rule 23(a)(1) requires that a class be 'so numerous that joinder of all members is impracticable.'" *Boley v. Universal Health Servs., Inc.,* 337 F.R.D. 626, 631 (E.D. Pa. 2021), *aff'd,* 36 F.4th 124 (3d Cir. 2022), *citing* Fed. R. Civ. P. 23(a)(1). "While no threshold number is required, a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing that the potential number of plaintiffs exceeds 40. *Boley*, 337 F.R.D. at 631. *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.,* 2019 WL 4645331, *6 (E.D. Pa. Sept. 24, 2019).[3]

Plaintiffs seek to combine the claims of all people who have worked as PPD ranking officers since 2013. The City's sworn Responses to Plaintiffs' Interrogatories establish that approximately 230 people have worked as PPD ranking officers from 2013 to present. (App102) (Response 1). It would be impracticable to join approximately 230 people into a single lawsuit challenging the propriety of Defendants' conduct. This overwhelming burden is precisely what the class action device was intended to alleviate – and precisely why the Court should find the

---

[3] Defendants have not contested Plaintiffs' satisfaction of this requirement.

numerosity requirement satisfied here.

**2.    The Class shares common questions of law and fact**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." *Boley*, 337 F.R.D. at 631, *citing* Fed. R. Civ. P. 23(a)(2). The commonality requirement is satisfied where "the proposed class members share at least one question of fact or law with the grievances of the prospective class" and the plaintiff demonstrates "the class members have suffered the same injury." *Id.* Importantly, "a single common question or fact is sufficient to satisfy the commonality requirement. *Id. See In re Comcast Corp.*, 2019 WL 4645331, at *6, *citing Wal-Mart Stores, Inc.*, 564 U.S. at 359. In fact, "cases involving wage claims present perhaps the most perfect questions for class treatment." *Altnor v. Preferred Freezer Services, Inc.*, 197 F. Supp. 3d 746, 756-57 (E.D. Pa. 2016) (citation omitted).[4]

The commonality requirement is met here because, as discussed above, Plaintiffs' claims plainly present common questions of law and fact including: whether CSR 31.06 required Defendants to pay PPD ranking officers wages for working over 40 hours per week on emergency activities; whether PPD ranking officers' emergency work beyond their regular schedule is owed at a straight-time or overtime premium rate; and whether Defendants were entitled to provide compensatory time for the emergency work PPD ranking officers performed. These questions are also common because of the overwhelming similarity of Plaintiffs' employment setting, which includes working in similar jobs, in the same location, under the same policies, practices, terms and conditions, receiving the same training and supporting their claims with materially-identical proof. *See* Section II. Because Plaintiffs' claims turn on clearly-identifiable common issues, they

---

[4] Plaintiffs believe Defendants contest their satisfaction of this requirement, as in Section I, above.

satisfy the commonality requirement.[5]

### 3.    Named Plaintiffs' claims are typical of the Class members' claims

"Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Boley*, 337 F.R.D. at 631, *citing* Fed. R. Civ. P. 23(a)(3). The typicality inquiry asks whether the named plaintiffs' claims are "typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Id. See In re Comcast Corp.*, 2019 WL 4645331, at *6, *citing Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). "The Third Circuit sets 'a low threshold for satisfying' the typicality requirement." *Id.* at *7, *citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 183 (3d Cir. 2001). So long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id. See Boley*, 337 F.R.D. at 631 ("even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories").[6]

The Named Plaintiffs' claims are typical of the Class members' claims in this matter because, as discussed at length above, their claims flow from Defendants' implementation of common policies and practices that, although having caused PPD ranking officers to track most of the hours they spent on overtime emergency work, did not pay wages for this work to any PPD

---

[5] While each Plaintiff may be entitled to different damages based on the number of weeks they worked as a PPD ranking officer during the relevant period, differences in the value of individual damages do not preclude commonality. *Villa v. Cargill Meat Sols. Corp.,* 2024 WL 4374958, *15 (M.D. Pa. Oct. 2, 2024) ("requirements of commonality and predominance have been satisfied despite the individual issues presented in this case regarding damages"); *Rougvie v. Ascena Retail Grp., Inc.,* 2016 WL 4111320, *15 (E.D. Pa. July 29, 2016) ("We do not find the differences in state law damage calculations destroy commonality or adequacy").

[6] Plaintiffs believe Defendants contest their satisfaction of this requirement, as in Section I, above.

ranking officer except for a few specific instances when the federal or state government provided funds for an emergency activation. *See* Section II. As a result of these similarities, Named Plaintiffs' interests are aligned with the Class members' interests in the pursuit of their claims to recover these wages. Named Plaintiffs' typicality is further demonstrated by the fact they are pursuing the same claims as the Class members, based on the same conduct by Defendants, and subject to the same defenses.

### 4.    Named Plaintiffs and their counsel will adequately represent the Class members

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." *Boley,* 337 F.R.D. at 636, *citing* Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re Comcast Corp.*, 2019 WL 4645331, at \*7, *citing Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625 (1997). "Class members are adequately represented if class counsel is qualified to represent the class and the interests of the class representatives are not in conflict with the interests of the class members." *Boley,* 337 F.R.D. at 636, *citing Galt v. Eagleville Hosp.,* 310 F. Supp. 3d 483, 491 (E.D. Pa. Apr. 19, 2018).[7]

Plaintiffs' counsel have vigorously prosecuted this action at arm's length from Defendant's counsel, as in the many other class actions they have litigated in state and federal courts nationwide, so can adequately represent the Class. Stephan Zouras LLC CV (App325-350) and Patricia V. Pierce CV (App351-352).

Further, Named Plaintiffs are adequate Class representatives. Named Plaintiffs worked as PPD ranking officers in Philadelphia during the relevant period, routinely performed unpaid emergency work beyond their regular 40-hour schedules, recorded the majority of this time on

---

[7] Defendants have not contested Plaintiffs' satisfaction of this requirement.

their DARs using various overtime codes, were not paid any wages for the vast majority of these hours, and have brought this action to challenge this result. No fundamental intra-class conflict exists here, because Named Plaintiffs have a strong interest in establishing Defendants' liability and seek the same type of damages as the Class members for the same alleged violations. Accordingly, both Named Plaintiffs' interests and incentives align with those of the proposed Class members. *Boley,* 337 F.R.D. at 636; *In re Comcast Corp*., 2019 WL 4645331, at *8.

## C.    This Action Meets The Requirements For Class Certification Under Rule 23(b)(3)

For a lawsuit to proceed as a class action, Plaintiffs must also satisfy one of the sub-parts of Federal Rule of Civil Procedure 23(b). In this case, Plaintiffs seek certification under Rule 23(b)(3) which requires: "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1.    Common questions of law and fact predominate

"Under Rule 23(b)(3), an opt-out class may be maintained if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *In re Comcast Corp*., 2019 WL 4645331, at *8, *citing* Fed. R. Civ. P. 23(b)(3). This inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation [and] determine whether the proposed class would achieve economies of time, effort, and expense." *Id.* at *8, *citing Amchem,* 521 U.S. at 623. "The focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id.*, *citing Sullivan v. DB Investments, Inc*., 667 F.3d 273, 298 (3d Cir. 2011).[8]

---

[8] Plaintiffs believe Defendants contest their satisfaction of this requirement, as in Section I, above.

Here, based on the litany of common facts described at length herein, Plaintiffs suggest that Defendants engaged in a common course of conduct that equally denied wages owed to all PPD ranking officers under CSR 31.06 for performing emergency work beyond their regular schedules. These claims present many common, material questions of law and fact that clearly predominate over any individual issues Defendants may raise, supporting a grant of class certification. *In re Comcast Corp*, 2019 WL 4645331, at *9.

### 2.    A class action is the best way to litigate Plaintiffs' claims

"Rule 23(b)(3) requires 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* at *9, *citing* Fed. R. Civ. P. 23(b)(3). "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication.'" *Id.*, *citing In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 533-534 (3d Cir. 2004).[9]

Here, the putative Class includes approximately 230 people who worked as PPD ranking officers in Philadelphia during the relevant period, routinely performed unpaid emergency work beyond their regular 40-hour schedules, recorded the majority of this time on their DARs using various overtime codes, were not paid any wages for the vast majority of these hours, and have brought this action to challenge this result. *See* Section II. While Defendant may owe each individual Plaintiff a different amount of damages depending, for example, on the duration of their employment, there is no clear reason why any individual Class member would need or want to control the litigation of their own claim. *In re Comcast Corp*., 2019 WL 4645331, at *9, *citing In re Warfarin*, 391 F.3d at 534 (individual class members have little interest in "individually controlling" separate actions since each has a small claim in relation to the cost of prosecution). It

---

[9] Plaintiffs believe Defendants contest their satisfaction of this requirement, as in Section I, above.

is also relevant that, after approximately a year of litigation, no other PPD ranking officer has stepped forward to file a competing claim.  *Id.* at *9, *citing In re Warfarin*, 391 F.3d at 534.

Finally, given the predominance of common issues presented by Plaintiffs' claims and this Court's particular skill in the management of highly complex, multi-party litigation, the management of this case does not present issues that should preclude class certification.  *In re Comcast Corp.*, 2019 WL 4645331, at *22; *Verma v. 3001 Castor, Inc.*, 2016 WL 6962522, *14 (E.D. Pa. Nov. 29, 2016); *In re Nat'l Football League Players' Concussion Injury Litig.*, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *aff'd* 821 F.3d 410 (3d Cir. 2016); *Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 137 (E.D. Pa. 2010); *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 491 (E.D. Pa. 2009).

## IV.    PLAINTIFFS' PROPOSED CLASS NOTICE AND DISSEMINATION PLAN

When courts certify a class under Rule 23(b)(3), they must direct notice to the class in the best way practicable under the circumstances.  *Sorace v. Wells Fargo Bank, N.A.*, 2024 WL 643229, *3 (E.D. Pa. Feb. 15, 2024), *aff'd*, 2024 WL 5116797 (3d Cir. Dec. 16, 2024).  Rule 23(c)(2)(B) clarifies this requirement as including:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  Plaintiffs' proposed Class Notice contains this information, so merits this Court's approval.  *See* Proposed Class Notice (Exhibit A).

Further, to support the notice administration process, Plaintiffs ask the Court to order production of a computer-readable Excel file containing the full name, last-known mailing address,

e-mail address, and telephone number, of each person matching the Class definition along with the last four digits of their Social Security number[10] within ten days of the class certification Order. These elements are all standard in modern notice dissemination plans.[11] Promptly after receiving this information, Plaintiffs' designee will perform all necessary address searches and disseminate the Notice to all Class members by First-Class U.S. Mail and e-mail and perform all necessary re-delivery efforts. Together, the components of Plaintiff's Notice and distribution plan merit approval as thorough, fair, and typical of efforts routinely approved in this Court.

## V.    CONCLUSION

The class action procedure is one of the most effective and efficient means to address claims of a defendant-employer's wrongful wage denial. Named Plaintiffs' claims satisfy the requirements of Fed. R. Civ. P. 23(a) and (b)(3), demonstrating that class-wide treatment of the issues they raise will provide an efficient, fair, and manageable means of adjudicating this dispute. Considering the strong public policy grounds favoring class certification and the extensive evidence demonstrating that Named Plaintiffs' claims share an extensive array of common facts with the Class members' claims, Named Plaintiffs respectfully ask the Court to grant this Motion and enter their proposed Order.

---

[10] The last four digits of a Social Security number are valuable in disseminating class notice because they are a reliable, unique identifier to confirm and update contact information, which is crucial for reaching potential class members who have moved or changed their name over time.

[11] *See Sorace v. Wells Fargo Bank, N.A.*, 2024 WL 643229, *4 (E.D. Pa. Feb. 15, 2024), *aff'd*, 2024 WL 5116797 (3d Cir. Dec. 16, 2024) (last known address, telephone number and e-mail address); *In re Suboxone Antitrust Litig.*, 2021 WL 5758896, *2 (E.D. Pa. Dec. 3, 2021) (mail and e-mail addresses); *Wood v. Saroj & Manju Invs. Philadelphia LLC*, 2020 WL 7711409, *2 (E.D. Pa. Dec. 28, 2020) (last known address, telephone number and last four digits of Social Security numbers); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 4102586, *2 (E.D. Pa. Sept. 14, 2017) (mailing address and phone number).

Respectfully submitted,

Dated: September 11, 2025

/s/ David J. Cohen
David J. Cohen
STEPHAN ZOURAS LLC
604 Spruce Street
Philadelphia, PA  19106
(215) 873-4836
dcohen@stephanzouras.com

Ryan F. Stephan
James B. Zouras
Catherine Mitchell Duffy
STEPHAN ZOURAS LLC
222 W. Adams Street
Chicago, IL 60606
(312) 233-1550
rstephan@stephanzouras.com
jzouras@stephanzouras.com
cmitchell@stephanzouras.com

Patricia V. Pierce
GOLDSHAW GREENBLATT PIERCE
Two Penn Center, Suite 1230
1500 John F. Kennedy Boulevard
Philadelphia, PA  19102
(215) 978-9090
ppierce@ggplawfirm.com

Counsel for Plaintiffs and the
putative Class members