## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER FLACCO, WINTON SINGLETARY | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO. 24-4374 |
| | : | |
| DANIELLE OUTLAW, CHARLES RAMSEY, RICHARD ROSS, JR., KEVIN BETHEL, MICHAEL ZACCAGNI, PEDRO RODRIGUEZ, ALBERT D'ATTILIO, JOHN STANFORD, JR., CANDI JONES, CITY OF PHILADELPHIA | : : : : : : : : | |

## MEMORANDUM

**KEARNEY, J.**                                                    **November 7, 2025**

Two Philadelphia ranking police officers sued the City of Philadelphia, several of its Police Commissioners, and several of its human resources directors seeking overtime compensation during emergency periods over the past twelve years based on their interpretation of a Civil Service Commission regulation governing overtime pay during a period of emergency. They seek, after we declare the City misinterprets the regulation, to order the City pay them overtime compensation for hours they recorded on daily activity sheets since 2013 as part of the daily recording of hours and then separate out the emergency from non-emergency time on a day-by-day basis for each officer. The City's potential overtime compensation liability to the two ranking officers will be resolved following the close of discovery.

But today is a different issue: the two ranking officers now ask for permission under Federal Rule of Civil Procedure 23(b)(3) to represent a class of 230 salaried ranking officers claiming they are all owed money for overtime work authorized by the then-Police

Commissioner during periods of emergency since 2013. We afforded extensive discovery to allow the ranking officers and City to identify common issues. We held extensive oral argument on the request for class treatment.

We decline to certify a proposed class of ranking officers who self-report overtime without distinguishing emergency time over the last twelve years. We lack a common answer as to how we could evaluate overtime compensation for 230 ranking officers without an individualized assessment of the exact hours they worked, at whose direction, for what purposes, and accounting for the compensation paid to them years ago for non-emergency time billed with other time under a collective bargaining agreement. The ranking officers' lack of a common question arising from their view of a global issue of the City misinterpreting a Civil Commission regulation affirms our finding after rigorous examination required by our Court of Appeals including as recently as six years ago in an analogous case reviewing a request to certify a class of workers seeking overtime wages. The salaried ranking officers' analysis does not work in a damages class as the individualized assessments predominate over the common legal issue of whether the City and its agents misinterpreted a Civil Commission regulation for over a dozen years.

## I.    Adduced Evidence

Christopher Flacco and Winton Singletary serve as Philadelphia Police Department Ranking Officers. Ranking Officers include Captains, Staff Inspectors, Inspectors, and Chief Inspectors.[1] Their compensation is partially defined by regulations issued by the Civil Service Commission and by a Collective Bargaining Agreement. Ranking Officers typically work forty hours per week with an eight-hour workday and the workday can be flexed.[2]

2

***The City must compensate overtime authorized by the Commissioner on emergency periods at the regular rate of pay and not use compensatory time.***

The Pennsylvania General Assembly issued the Philadelphia Home Rule Charter in 1949.[3] The General Assembly through the Home Rule Charter gave the City authority to manage its operations and issue regulations.[4] It created the Personnel Director to draft regulations on civil service employee classification, pay, and work conditions for review by the Civil Service Commission.[5] It authorized the Commission to approve Civil Service Regulations.[6] The Commission enacted Civil Service Regulation 31.06 fifteen years later detailing the "Emergency overtime pay for ranking officers in the police and fire departments" and amended it in 1976.[7]

The Commission requires the City pay ranking officers overtime at the regular pay rate when their Commissioner authorizes them to work during an undefined "period of emergency nature" through Regulation 31.06.[8] The Commission also directs the ranking officers cannot "accrue compensatory time during the period of the emergency."[9] Ranking officers working overtime when authorized by the Commissioner during a period of emergency nature must be paid overtime and not through compensatory time.

***The City also compensates non-emergency overtime with compensatory time under a Collective Bargaining Agreement.***

Ranking Officers Flacco and Singletary also belong to a bargaining unit represented by the Fraternal Order of Police, Lodge No. 5.[10] The Policemen and Firemen Collective Bargaining Act governs the bargaining relationship between the Fraternal Order and the City.[11] The Fraternal Order and the City have negotiated under the Act since the 1960s resulting in the now governing Collective Bargaining Agreement.[12] The Agreement purports to define Ranking Officers' employment including compensation.[13] The Agreement incorporates existing Civil Service Regulations and clarifies "[t]he inclusion of these Civil Service Regulations is for the

3

purpose of providing a more complete and lucid document and is not intended to abridge in any way the right of the City under the Home Rule Charter to manage its employees and to effect changes in all personnel matters, including the right of the Civil Service Commission to amend any Civil Service Regulations consistent with the City's obligations. . . ."[14]

The Agreement grants compensatory time for hours worked beyond the regular workday, up to a 1,300-hour cap.[15] Ranking Officers may use compensatory time for leave, cash out up to 120 hours annually, and cash out up to 690 hours at retirement.[16] Each use or cash out reduces the Ranking Officer's balance but accrual may continue until the 1,300-hour cap is reached.[17] The Agreement does not make Ranking Officers eligible for overtime pay for hours worked beyond forty each week.[18] It only allows straight-time pay for extra hours for specific events or shifts.[19] The City and the Fraternal Order have also made agreements outside the Collective Bargaining Agreement to pay additional cash compensation for special events and circumstances.[20]

Both the Collective Bargaining Agreement and Regulation 31.06 address how Ranking Officers are compensated for work beyond their regular schedules. The Agreement provides compensatory time while Regulation 31.06 separately directs Ranking Officers performing work "during a period of emergency nature" receive wage payments rather than compensatory time.

### Ranking Officers' time reporting practices.

Ranking Officers record their hours on a daily basis using the Daily Attendance Report system.[21] They must enter all regular and overtime work in the Report system.[22] Police Department Directive 11.1 (Daily Attendance Report) directs each overtime entry include the Ranking Officer's time in and out, total hours earned, an assignment code "to show how the overtime was earned," and "the reason for accrual in the 'Remarks' section."[23]

Appendix C (Overtime Codes) to Directive 11.1 lists nearly 100 different assignment codes used to record overtime hours.[24] Ranking Officers use Code 31, categorized as "administrative," for all time worked beyond a Ranking Officer's regular schedule unless the Department assigns a special event-specific code.[25] Ranking Officers use Code 31 for a wide range of work, including administrative duties, "emergency" work, meeting preparation, community events, trainings, and other incidents.[26] Ranking Officers Flacco and Singletary have also used other codes, such as Codes 35, 43, 46, 75, 78, and 85, to record overtime.[27] The Commissioner and City's payroll professionals do not provide a specific code for "emergency" work.[28]

The City through Appendix C further requires "[r]emarks explaining the reason for accrual [to be] stated for each entry" and states all compensatory time "will be substantiated in the 'Remarks' column."[29] But remarks are not consistently provided or recorded in a standardized format.[30] Some remarks for Code 31 entries contain only single words like "captain" or "inspector," while others include brief descriptions such as "staffing issue 3plt," "comp time," "insp – admin," "S/I A&I," or "C/I OPR."[31]

Ranking Officers Flacco and Singletary and eight additional Ranking Officers now report they spent an average of three to four hours per week beyond their forty-hour schedules "performing emergency work" across their employment as Ranking Officers.[32] They perform many of the same types of "emergency" work, such as active-shooter incidents, assaults, mass shootings, robberies, fires, burglaries, riots, barricades, protests, looting events, serious medical emergencies, motor-vehicle accidents, drug-related incidents, and mental-health crises, but also describe distinct incidents.[33] Some Ranking Officers report train derailments; others report airplane crashes, parades, sporting events, major concerts, or "special event" details.[34]

The confusion arises because Ranking Officers accrue compensatory time for all overtime hours—routine and "emergency" alike—under the Collective Bargaining Agreement, which limits accrual to 1,300-hours. This accounting includes "emergency period" work covered by Regulation 31.06, which requires the City pay regular wages instead of compensatory time. Ranking Officers may use or cash out this time but receive no pay for "emergency period" work under Regulation 31.06. Those who exceed the 1,300-hour cap while performing "emergency" work receive no additional compensation, even though Regulation 31.06 sets no such limit.

### The Ranking Officers learn of Regulation 31.06 in 2023.

The City's former Human Resources Director issued a memorandum to "All Offices, Boards, and Commissions" titled "Amendments to the Civil Service Regulations – Transmittal #336" on November 13, 2013.[35] The memorandum transmitted updates to the Civil Service Regulations effective September 23, 2013.[36] Regulation 31.06 appeared in the transmittal although the Commission did not then amend it (and has not done so since 1976).[37] The Commissioners and the Police Commander Association Presidents met regularly in the years following to discuss issues affecting Ranking Officers.[38] The Association Presidents alleged they frequently asked the Commissioners about Ranking Officers' lack of pay for emergency work performed beyond regularly scheduled hours during these meetings.[39] Ranking Officers allegedly echoed these same concerns during Command briefings, incident briefings, and post-incident debriefings throughout the same period.[40]

Two Ranking Officers discovered Regulation 31.06 in February 2023 while researching their complaints about unpaid emergency work.[41] Ranking Officers continued to raise the issue of wages for emergency overtime work with Department and City officials throughout 2023.[42] The Commander Association sent a formal letter to City officials in May 2024 requesting the City implement Regulation 31.06 for Ranking Officers and pay them backpay for emergency

work performed since 2013.[43] Ranking Officers Flacco and Singletary and the eight additional Ranking Officers did not become aware of Regulation 31.06 until Fall 2023.[44] The City did not agree and has not paid regular wages for "emergency period" work authorized by the Commissioner beyond their regularly scheduled hours under Regulation 31.06.[45]

### *Ranking Officers Flacco and Singletary sue for overtime backpay.*

Ranking Officers Flacco and Singletary sued the City of Philadelphia and nine current and former Commissioners and Philadelphia Office of Human Resources Directors in their individual capacities.[46] They are seeking overtime wages for "emergency" work they allegedly performed since September 2013 because Regulation 31.06 "created an exception, mandating that [ R]anking [O]fficers receive wages, not compensatory time, for hours worked beyond their regular schedule during an emergency."[47] They allege the Commissioners, Human Resources officials, and City (1) failed to pay Ranking Officers wages for "emergency" work performed beyond their regularly scheduled hours as required by Regulation 31.06 and (2) failed to provide procedural due process before denying those wages.[48] They assert a claim under the Pennsylvania Wage Payment and Collection Law against the Commissioners and Human Resources officials and a Fourteenth Amendment procedural due process claim against the Commissioners, Human Resources officials, and City.[49]

The parties engaged in extensive discovery closing on November 17, 2025.[50] We begin trial on January 5, 2026.[51]

### II.    Analysis

Ranking Officers Flacco and Singletary now seek to certify a class under Federal Rules of Civil Procedure 23(a) and 23(b)(3) of "[a]ll [Philadelphia Police Department] Captains, Staff Inspectors, Inspectors, or Chief Inspectors who have performed unpaid emergency work beyond

their scheduled hours since September 23, 2013."[52] They estimate the putative class includes approximately 230 Ranking Officers because the City stated approximately 230 individuals have served as Ranking Officers from 2013 to present.[53] But serving as a Ranking Officer does not necessarily mean the Ranking Officer performed "unpaid emergency work" "authorized by the Commissioner" within the meaning of Regulation 31.06. As discussed below, even identifying who belongs in the putative class depends on individualized determinations about the nature of each Ranking Officer's work and whether the City otherwise compensated the Ranking Officer for the overtime.

We are directed by our Court of Appeals class certification is appropriate only if, after "rigorous analysis," we conclude Ranking Officers Flacco and Singletary meet "each and every element" of Federal Rule of Civil Procedure 23 "by a preponderance of the evidence."[54] "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."[55]

The Supreme Court through Rule 23(a) defines four prerequisites for class certification: "(1) the class must be so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy)."[56] The Supreme Court through Rule 23(b)(3) requires "the questions of law or fact common to class members predominate over questions affecting only individual members" and the class action mechanism be "superior to other available methods for fairly and efficiently adjudicating the controversy."[57] When a plaintiff seeks class certification under Rule 23(b)(3), as Ranking Officers Flacco and Singletary

do here, the Rule 23(a) commonality requirement is subsumed by the Rule 23(b)(3) predominance requirement.[58]

Ranking Officers Flacco and Singletary assert the class should be certified under Rule 23(b)(3) because the putative class includes approximately 230 identified Ranking Officers; all Ranking Officers share materially similar employment circumstances governed by the same policies and pay practices; the key legal and factual issues apply uniformly across the putative class; their own claims arise from the same course of conduct and seek the same relief, ensuring their interests align with the putative class; and collective adjudication is the most fair and efficient way to resolve the claims.[59]

The City and its named Police Commissioners and Human Resources Directors oppose class certification under Rule 23(b)(3).[60] They overly focused on their interpretation of Regulation 31.06 as a matter of liability and parsing the terms which all parties agreed can be defined as a matter of law assuming no ambiguity. But, returning to the Ranking Officers' present motion, the City and its agents argue Ranking Officers Flacco and Singletary: (1) cannot establish predominance or commonality because each putative class member's claims involves highly individualized factual and legal determinations; (2) differ from their putative class members such that they cannot show typicality and adequacy; (3) have not presented the number of class members, or a methodology for calculating that number, failing to prove numerosity and ascertainability; and (4) cannot show superiority as the putative class is unmanageable and ill-suited for class treatment.[61]

We held extensive oral argument aided by experienced counsel.[62] The parties confirmed the multiple individualized assessments required to determine overtime wages owed for days claimed to be "emergency periods" authorized by the Commissioners over the past twelve years.

Ranking Officers Flacco and Singletary have not satisfied the commonality prong under Rule 23(a)(2) or the predominance prong under Rule 23(b)(3). We must deny class certification.

### A. Ranking Officers Flacco and Singletary have not shown a plausible basis to find commonality and predominance.

Ranking Officers Flacco and Singletary have not met the commonality nor predominance requirements set by the Supreme Court before certifying they can represent 230 ranking officers for overtime wages over the past twelve years.

"The commonality and predominance requirements are closely linked."[63] "The key to commonality is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."[64] But the predominance requirement is "far more demanding than the commonality requirement."[65] "If the commonality requirement cannot be met, then the more stringent predominance requirement obviously cannot be met either."[66]

Predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."[67] We must "give careful scrutiny to the relation between common and individual questions in a case."[68] "Individual issues are those 'where members of a proposed class will need to present evidence that varies from member to member' and common issues are those where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"[69] "Although the presence of individual questions does not *per se* rule out a finding of predominance and individual questions need not be absent, a putative class fails to clear the predominance requirement when a district court formulates some prediction as to how specific issues will play out in a given case and concludes it cannot be

adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication."[70] "The purpose of Rule 23(b)(3)'s predominance requirement 'is to determine whether a class action would achieve economies of time, effort, and expense and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness.'"[71] We "must be pragmatic in our assessment of the entire action and all the issues involved."[72]

Ranking Officers Flacco and Singletary claim they satisfy the commonality requirement because their claims "plainly present common questions of law and fact" supported by "materially-identical proof."[73] They identify several shared questions but assert the "overarching common question" is whether the City, Commissioners, and Human Resources Directions should have paid wages instead of compensatory time for emergency work Ranking Officers performed beyond their regular schedules.[74] They maintain all Ranking Officers worked under the same employment structure, pay practices, and departmental directives governing overtime and compensatory time.[75] Because the claims "turn on clearly-identifiable common issues, they satisfy the commonality requirement."[76]

They further contend they meet the predominance requirement because the common questions of law and fact "clearly" outweigh individual differences among putative class members.[77] They assert the City, Commissioners, and Human Resources Directors' alleged uniform course of conduct—failure to pay wages under Regulation 31.06—applied equally to all Ranking Officers.[78] Individualized issues such as whether each Ranking Officer "may be entitled to different damages based on the number of weeks they worked" do not "preclude commonality."[79] The "need to calculate damages on an individual basis . . . is not a basis to deny certification."[80]

Ranking Officers Flacco and Singletary offer the ten putative class members' sworn declarations describing the types of overtime emergency work they performed and the time spent on this work to support their argument.[81] "Additional evidence confirming and supporting this work is found [in the Daily Attendance Reports which] were used to record *most* of the emergency work the Class members performed beyond their scheduled hours under [] Codes 31, 35, 43, 46, 75, 78, 85, and others."[82] Ranking Officers Flacco and Singletary maintain they and the putative class members "were *typically* scheduled to work 40 hours per week," "*routinely* spent 3-4 hours beyond their regular schedule each week on emergency-related work (*e.g.,* staffing police shootings, riots, protests, looting events, and hostage situations)," and "*typically* used Overtime Code 31 and *various other* overtime codes to record this work."[83] They also acknowledge performing non-emergency work beyond forty hours per week and receiving compensatory time.[84]

The City along with its named Police Commissioners and Human Resources Directors respond Ranking Officers Flacco and Singletary cannot satisfy the commonality or predominance requirements because each putative class member's entitlement to relief under Regulation 31.06 turns on highly individualized factual inquiries.[85] They contend there is no uniform or objective definition of period of emergency, no standardized process for authorizing such work, no standard overtime code for emergency work in the Daily Attendance Records, and little, yet widely varied, specificity in the remarks Ranking Officers enter to describe their work effort.[86] Because Ranking Officers' schedules are flexible and their working hours vary, determining whether the work was performed during a qualifying emergency, whether it occurred outside the Ranking Officer's regular schedule, and whether the work went unpaid

would require officer-by-officer, event-by-event, factual determinations.[87] They argue those questions cannot be resolved through common proof. [88]

The City, Commissioners, and Human Resources Directors also argue the examples offered by Ranking Officers Flacco and Singletary and eight other Ranking Officers are too broad and inconsistent to define class-wide "emergency period" work.[89] They assert we would have to conduct individualized factual analyses for each Ranking Officer, each event, and each time entry because there is not a reliable method to identify which events qualify as emergencies or which hours fall under Regulation 31.06.[90] Assessing whether the City already compensated for this alleged varied overtime work poses another individualized layer, as compensatory time balances fluctuate with use, cash-outs, and accruals and include both emergency and non-emergency hours.[91] Determining whether each alleged instance of emergency work has gone unpaid would require an officer-by-officer assessment of timekeeping records, balances, and cash-outs.[92]

We are guided by our Court of Appeals' discussion of overtime wage claims on behalf of a putative claim including individualized determinations and predominance six years ago  in *Ferreras v. American Airlines*.[93] The putative class in *Ferreras* included all non-exempt, hourly American Airlines employees at Newark Airport.[94] The employees alleged American Airlines' timekeeping system paid them based on their scheduled shifts instead of their actual hours worked, resulting in unpaid time.[95] The timekeeping system calculated pay for the scheduled shift duration and automatically deducted thirty minutes for a meal break.[96] The system assumed they worked only during their scheduled hours and excluded any extra time before or after shifts even if employees clocked in early or clocked out late.[97] Employees who worked during those periods or through meal breaks received extra pay only if they reported the work to a supervisor

and obtained approval as an "exception."[98] They otherwise received no pay for time worked outside their scheduled shifts.[99] The two questions common to the class asked: (1) whether hourly-paid employees are not being compensated for all hours worked "due to the manner in which American operates its timekeeping system;" and (2) whether American Airlines has a policy that discourages employees from seeking exceptions for work done outside of their shifts.[100]

Our Court of Appeals vacated the grant of class certification because the employees failed to show commonality and therefore failed to show predominance. Neither question could be resolved on a class-wide basis because it was "not clear . . . how those questions can 'generate common *answers* apt to drive the resolution of the litigation.'"[101] The first question—whether certain employees are not being compensated for all hours worked—"cannot be answered by common evidence about the timekeeping system because a yes or no answer tells us nothing about actual common work habits, if there are any."[102] The employees "will still need to go through the process of *proving that each individual employee worked overtime* and is thus entitled to additional compensation, regardless of any common evidence about American's timekeeping system."[103]

The employees also failed to show predominance because they "will have to offer individualized proof to show that they were actually working during the various time periods at issue, the main point of dispute in this case."[104] They "cannot rely on the time clock to prove when they were actually working because there is conflicting evidence about whether they were working the entire time they were clocked in."[105] Some putative class members "testified that they began working immediately after clocking in" and "[o]thers testified that they chatted with co-workers or watched TV after clocking in but before their shifts began."[106] Whether the

14

employees "were actually working pre- and post-shift is an open and inherently individualized question."[107] They "would have to offer individualized evidence regarding which meal breaks they spent working and for how long. And, of course, any claim that an employee was working off-the-clock would require an individualized inquiry as to when and to what extent that happened."[108] Our Court of Appeals found "[t]here is no easy measure, like the time clock, to which the parties can turn to determine the amount of time an employee may have been working. Accordingly, plaintiffs would again need to provide particularized evidence to show when employees were working, so common issues do not predominate over individual ones."[109]

We are persuaded by our Court of Appeals' analysis in *Ferreras* when reviewing a request to certify a class seeking overtime wages.[110] Ranking Officers Flacco and Singletary's proposed common questions will not generate common answers to drive the resolution of the litigation. Their central question—whether Regulation 31.06 required the City, Commissioners, and Human Resources Directors to pay wages instead of compensatory time for emergency work performed beyond regular schedules—is not what they are seeking by way of damages in their case. And the issues as to how we could possibly measure the overtime for emergency matters cannot be answered through common proof. "A yes or no answer tells us nothing about the actual common work habits."[111] Applying our Court of Appeals' specific language in *Ferreras,* Ranking Officers Flacco and Singletary "will still need to go through the process of proving that each individual [Ranking Officer] worked [unpaid emergency] overtime and is thus entitled to [wages], regardless of any common evidence about [the Commissioners, Human Resources Directors, and City's common course of conduct equally denying the wages].[112] Shared policies and codes cannot generate common answers when the core disputes—whether a Ranking Officer performed qualifying emergency work and whether it went unpaid on a day-by-day basis

accounted in commingled time records—depend on the facts of each event, each time entry, and each Ranking Officer. Whether and to what extent Ranking Officers performed "unpaid emergency" work cannot be established through common evidence.

The same problem prevents us from even identifying the proper members of the putative class. We cannot determine who falls within the putative class, let alone whether a purportedly common question applies to them, without resolving the same individualized inquiries into what work each Ranking Officer performed, whether it qualified as "emergency" work under Regulation 31.06, and whether the City already compensated for it (possibly in error) as part of the commingled emergency and other overtime.

The ten declarations Ranking Officers Flacco and Singletary offer confirm these central differences. Each declarant identifies many overlapping types of emergency work: active shooter incidents, assaults, mass shootings, robberies, fires, burglaries, riots, barricades, protests, looting events, serious medical emergencies, motor vehicle accidents, drug-related incidents, and mental health crises.[113] But the declarations also reflect individual differences. For example, Ranking Officers McCarrick and Singletary identify train derailments,[114] while Ranking Officer Heinzeroth identifies an airplane crash.[115] Ranking Officers Flacco and Layton identify parades and sporting events,[116] and Ranking Officer Love-Craighead identifies "special event details."[117] But Ranking Officer McCarrick identifies "mass gatherings like major concerts/professional sports celebration events and planning."[118] Ranking Officer Clark alone identifies injured officers and officer deaths.[119] These factual differences mirror the differing work patterns precluding predominance as our Court of Appeals instructed in *Ferreras*.

The Ranking Officers' Daily Attendance Reports also offer no common means of resolving these differences. Ranking Officers record all of their overtime under multiple codes

and the most commonly used Code 31 captures both administrative and emergency work. Remarks fields are often blank or contain only brief notations such as "captain," "comp time," or "insp – admin."[120] No uniform code or remark distinguishes emergency work from routine overtime. Determining whether a particular entry qualifies as emergency work under Regulation 31.06 requires reviewing each Ranking Officer's reports, understanding the context of each event, and assessing whether it occurred during an "emergency." Ranking Officers Flacco and Singletary "will have to offer individualized proof they were actually [performing emergency work] during the [various periods of overtime]."[121]

Ranking Officers Flacco and Singletary would still need individualized proof to show the City did not pay for "emergency" work even if they could identify when each Ranking Officer performed such work. Ranking Officers accrue, use, and cash out compensatory time at varying times and their balances combine hours from both emergency and non-emergency work. Determining whether a particular instance of "emergency" work remains uncompensated would require reviewing each Ranking Officer's time records, usage, and cash-out history. These inquiries depend on individualized evidence and cannot be resolved through proof common to the class.

We are also not persuaded by the cases Ranking Officers Flacco and Singletary rely on to support commonality and predominance. In *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litigation,* Judge Brody found commonality because all plaintiffs alleged the same injury—the payment of supracompetitive prices—stemming from a single, uniform tying arrangement among other common questions of fact and law.[122] Judges Robreno and Murphy's analyses detailed in *Altnor v. Preferred Freezer Servs., Inc.* and *Davis v. Target Corp.* likewise involved uniform policies applied identically to all putative class members.[123] Unlike in those

cases, Regulation 31.06 before us does not operate as a single policy affecting all Ranking Officers in the same way. Whether it applies to a Ranking Officer depends on individualized determinations of the work performed as authorized by the Commissioner on a particular day, whether it qualified as "emergency" work, and whether the City otherwise compensated for this time on a day-by-day basis. And the Ranking Officers' reliance on our Court of Appeals' analysis a few months ago in *Drummond v. Progressive Specialty Ins. Co.* confirms our view. Our Court of Appeals vacated the grant of class certification because "[t]he District Court would need to evaluate plaintiff-by-plaintiff proof . . . [as] to which plaintiffs [the defendant] is liable" and so "common issues as to [the defendant's] liability do not predominate."[124]

Ranking Officers Flacco and Singletary did not adduce evidence allowing a class-wide resolution seeking back pay for overtime under Rule 23(b)(3). The essential questions—what counted as "emergency" work, whether a Commissioner authorized it, and whether the City already compensated for it—require granular, officer-by-officer analysis. The evidence does not reveal a uniform policy able to be tested with common proof but instead a collection of individualized determinations dominating the record.

### B.  We do not opine on the remaining Rule 23(a) requirements or other aspects of Rule 23(b)(3).

We need not today address numerosity, typicality, and adequacy of representation under Rule 23(a), ascertainability or the superiority prong of Rule 23(b)(3), or other arguments relating to tolling of the statute of limitations on an officer-by-officer basis.

### III.    Conclusion

Ranking Officers Flacco and Singletary are proceeding on a claim the City did not pay them for overtime authorized by the then-Commissioners for periods of emergency under the Civil Service Commission's regulation. Their proofs are necessarily different on a day-by-day

basis for their cases let alone for 230 salaried ranking officers. They did not adduce evidence allowing us to certify a class of other ranking officers (at an unknown number) who also billed for overtime which may have been related to emergency periods authorized by the then-Commissioner and which the City did not otherwise compensate them under a collective bargaining agreement. We find these individualized assessments of the exact hours they worked, at whose direction, for what purposes, and accounting for the compensation paid to them years ago for non-emergency time billed with other time under a collective bargaining agreement as presented today do not allow class certification on a damages class under Rule 23(b)(3).[125]

---

[1] ECF 75-1 at 1.

[2] ECF 77-8, Stanford Decl. ¶ 27, Ex. A at 11.

[3] ECF 53 ¶ 22.

[4] *Id.* (citing Home Rule Charter §1-100).

[5] *Id.* ¶ 23 (citing Home Rule Charter §7-400).

[6] *Id.* ¶ 24 (citing Home Rule Charter §7-200).

[7] ECF 77-9, LaBletta Decl. ¶ 10, Ex. A. The City suggested the first enactment responded to emergencies created by political unrest and the second in response to widespread unrest in Philadelphia. The Commission has not amended Regulation 31.06 since 1976.

[8] ECF 75-3, App25. The full text of Regulation 31.06 reads:

> Notwithstanding any contrary provisions in these Regulations, ranking officers of Captain to Chief Police Inspector inclusive in the Police Department and ranking officers of Battalion Chief and above in the Fire Department authorized to work by their respective Commissioners during a period of emergency nature, in excess of the number of hours of their regularly scheduled work day or, for all hours worked on a non-scheduled work day shall, for all hours of such overtime work, be paid at their then regular rate of pay. Personnel paid in accordance with this Section will not be entitled to accrue compensatory time during the period of the emergency. *Id*.

[9] *Id.*

[10] ECF 77-8, Stanford Decl., Ex. A at 1.

[11] *Id.*; ECF 77-10, Leheny Decl. ¶ 7.

[12] ECF 77-10, Leheny Decl. ¶ 7.

[13] ECF 77-8, Stanford Decl., Ex. A at 1; 43 P.S. § 217.1, *et seq.*

[14] ECF 77-8, Stanford Decl., Ex. A at 1–2.

[15] *Id.* at 12 ("Compensatory Time (In Lieu of Overtime)" – "Employees at the rank of Captain or above shall be granted compensatory time in lieu of overtime for all hours worked in excess of the normal work day. Compensatory time shall be computed on an hour for hour basis, and may be accrued up to thirteen hundred (1,300) hours maximum, effective July 1, 2014.").

[16] *Id.* at 13.

[17] *Id.*; ECF 77-8 Stanford Decl. ¶ 23.

[18] ECF 77-8, Stanford Decl., Ex. A at 60–61; ECF 53 ¶ 26.

[19] *Id.*

[20] ECF 77-9, LaBletta Decl. ¶ 12; ECF 75-3, App76, 104–05.

[21] ECF 75-3, App106–07; *see also id.*, App61–69.

[22] *Id.*, App56, 61.

[23] *Id.*, App66.

[24] *Id.*, App56–60.

[25] ECF 75-1 at 3, 10; ECF 75-3, App77–78.

[26] ECF 53 ¶ 37; ECF 75-3, App77–78.

[27] ECF 75-1 at 3; ECF 75-3, App33, 48.

[28] ECF 77-8, Stanford Decl. ¶¶ 30–31.

[29] ECF 75-3, App56.

[30] ECF 75-3, App78; *see also id.*, App279–82.

[31] *Id.*, App279–80.

[32] *Id.*, App284–85, 289, 293, 297–98, 301, 305, 309–10, 313–14, 318, 322. Ranking Officer Singletary reports he spent "10-12 hours" per week as distinct from other Ranking Officers. *Id.*, App322.

---

[33] *Id.*

[34] *Id.*, App293, 297, 309, 314, 318, 322.

[35] *Id.*, App23.

[36] *Id.*

[37] *Id.*, App23–25.

[38] ECF 53 ¶ 39.

[39] *Id.*

[40] *Id.* ¶¶ 40–43.

[41] *Id.* ¶ 44.

[42] *Id.* ¶¶ 45–46.

[43] *Id.* ¶ 47.

[44] ECF 75-3, App286, 290, 295, 299, 303, 307, 311, 315, 320, 324.

[45] ECF 53 ¶ 48.

[46] *Id.* ¶¶ 5–16. They sue Commissioners Charles Ramsey, Richard Ross, Jr., John Stanford, Jr., Danielle Outlaw, and Kevin Bethel, as well as Philadelphia Office of Human Resources Directors Albert D'Attilio, Pedro Rodriguez, Michael Zaccagni, and Candi Jones. *Id.* ¶¶ 7–15.

[47] ECF 75-1 at 5.

[48] ECF 53 ¶ 1–2.

[49] *Id.*; 43 Pa. C.S. §§ 260.1, *et seq.*; 42 U.S.C. § 1983.

[50] ECFs 69, 81.

[51] *Id.*

[52] ECF 75-1 at 2.

[53] *Id.* at 13.

[54] *In re Citizens Bank, N.A.*, 15 F.4th 607, 612 (3d Cir. 2021).

[55] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (citing Fed. R. Civ. P. 23(a)-(b)).

---

[56] *Id.* at 590–91 (quoting Fed. R. Civ. P. 23(a)).

[57] Fed. R. Civ. P. 23(b)(3).

[58] *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008)). Our Court of Appeals explained "we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement and therefore deem it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009)).

[59] ECF 75 ¶¶ 2–8. We addressed the largely declaratory nature of the Ranking Officers' claim during oral argument. They essentially ask us to find the City misinterprets Regulation 31.06 in the first instance.

[60] *See* ECF 77.

[61] *Id.* at 2.

[62] We pause to again extend our appreciation for counsels' willingness to present oral argument at the Upper Dublin High School as part of our Court's community outreach through civics education. ECF 82. The longest government lapse in appropriations in our nation's history required we cancel this important civics education and outreach as we could not compensate our law clerks and staff for travel and time out of our Courthouse. ECF 84.

[63] *Ferreras*, 946 F.3d at 185.

[64] *Connelly v. Amazon.com Servs., LLC*, No. 23-02768, 2025 WL 693258, at *4 (E.D. Pa. Mar. 4, 2025) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis in original).

[65] *Ferreras*, 946 F.3d at 185 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

[66] *Id.*

[67] *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

[68] *Id.* (internal quotation marks omitted).

[69] *Drummond v. Progressive Specialty Ins. Co*, 142 F.4th 149, 159 (3d Cir. 2025) (quoting *Tyson Foods*, 577 U.S. at 453).

[70] *Id.* (internal quotation marks and citations omitted).

[71] *Id.* at 162 (quoting *Sullivan*, 667 F.3d at 336 (Scirica, J., concurring)).

[72] *Id.* at 159 (internal quotation marks and citations omitted).

[73] ECF 75-1 at 14.

[74] *Id.*; ECF 80 at 1. The other common questions include whether the pay should be calculated at a straight-time or overtime rate and whether the City, Commissioners, and Human Resources Directors were entitled to substitute compensatory time in place of wages. ECF 75-1 at 14.

[75] ECF 75-1 at 14.

[76] *Id.* at 14–15.

[77] *Id.* at 18.

[78] *Id*.

[79] *Id.* at 15 n.5.

[80] ECF 80 at 5 (citing *Drummond,* 142 F.4th at 156 n.3).

[81] ECF 75-1 at 7–8; ECF 80 at 3; ECF 75-3, App284–85, 289, 293, 297–98, 301, 305, 309–10, 313–14, 318, 322.

[82] ECF 80 at 3; ECF 75-3, App33, 48, 56–59, 279–82.

[83] ECF 75-1 at 10 (emphasis added).

[84] *Id.*

[85] ECF 77 at 7, 9.

[86] *Id.* (citing ECF 77-8, Stanford Decl. ¶¶ 9–12, 30–31; ECF 77-11, Kim Decl. ¶ 13.)

[87] *Id.* at 7.

[88] *Id.*

[89] *Id.* at 8–9.

[90] *Id.* at 9.

[91] *Id.* at 10–11.

[92] *Id.*

[93] 946 F.3d 178 (3d Cir. 2019).

[94] *Id.* at 181.

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.* at 185.

[101] *Id.* (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis in original).

[102] *Id.*

[103] *Id.* (emphasis added).

[104] *Id.* at 186.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] Ranking Officers Flacco and Singletary submitted a post-argument letter brief hoping to distinguish our Court of Appeals' analysis in *Ferreras. See* ECF 86. They contend "no analogous facts or circumstances exist" because the Daily Attendance Report "entries represent affirmative, contemporaneous records of actual hours worked, so unlike in *Ferreras,* do not call for individual questions about whether the work reflected by the [overtime] Code entries was actually recorded or performed." *Id.* at 1. They also note our Court of Appeals in *Ferreras* addressed a management policy discouraging exception requests—an issue not present here— and argue the City, Commissioners, and Human Resources Directors uniformly refused to pay wages for any "emergency" work recorded under Code 31 or similar codes. *Id.* at 1–2.

We are not persuaded. The existence of contemporaneous entries does not resolve the individualized questions central to class certification here: whether a given entry (in whole or in part) reflects an "emergency" and whether the work remains uncompensated. Unlike in *Ferreras*, where variation arose from employees' work habits, here the variation lies in what each Ranking Officer did, how they recorded it, and whether they already received compensatory time— differences likewise precluding class-wide resolution.

[111] *Ferreras*, 946 F.3d at 185.

[112] *Id.*

[113] ECF 75-3, App284–85, 289, 293, 297–98, 301, 305, 309–10, 313–14, 318, 322.

[114] *Id.*, App318, App322.

[115] *Id.*, App297.

[116] *Id.*, App293, App309.

[117] *Id.*, App314.

[118] *Id.,* App318.

[119] *Id.*, App289.

[120] *Id.*, App279–80.

[121] *Ferreras*, 946 F.3d at 186.

[122] 333 F.R.D. 364, 375 (E.D. Pa. 2019).

[123] *Altnor v. Preferred Freezer Servs., Inc*. 197 F. Supp. 3d 746, 757 (E.D. Pa. 2016) (finding commonality where all hourly employees were subject to the same meal-break and timekeeping policies and whether they performed and were paid for meal-break work presented uniform, class-wide questions); *Davis v. Target Corp.*, 2023 WL 8373162, at *3–4 (E.D. Pa. Dec. 1, 2023) ("[T]he class members share the important common question of whether time spent walking from the building entrance to the time clocks and back again is compensable . . . and hence whether the employer's uniform policy of not paying workers for that type of time is sustainable under the law.").

[124] 142 F.4th at 156, 159.

[125] We mentioned during oral argument Congress' method of resolving overtime claims for employees who are not exempt under the Fair Labor Standards Act by requiring the employees opt into a collective action. The City's ranking officers are salaried employees not able to seek overtime under the Fair Labor Standards Act. But the principle remains. The employees in a collective action under the Act must each present their specific overtime including what they did on a particular day and time warranting unpaid overtime compensation.